**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MATTHEW CALI,<br><br>Plaintiff,<br><br>v.<br><br>TROUTMAN PEPPER LOCKE LLP; RON RAETHER; and AUDREY WISOTSKY,<br><br>Defendant. | Case No.: ______________<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Matthew Cali, by and through his undersigned counsel, Wigdor LLP, hereby alleges as follows:

## PRELIMINARY STATEMENT

1. Matthew Cali ("Mr. Cali") is a highly accomplished attorney whose partner-track career at Troutman Pepper Locke LLP ("Troutman") was systematically destroyed in the wake of a life-threatening heart attack, his exercise of rights protected by the Family and Medical Leave Act (the "FMLA"), his complaints about disability discrimination, and his courageous decision to blow the whistle on his supervising Partners' fraudulent billing practices that generated hundreds of thousands, if not millions, of dollars in ill-gotten gains at the expense of the Firm's clients and their insurers.

2. Mr. Cali joined the Firm's Princeton, New Jersey office in April 2018 and immediately distinguished himself as an exceptional litigator. Over the next five years, he argued motions in state and federal court, took dozens of depositions, sat second chair at trials and arbitrations, represented pro bono clients at hearings and trials, and brought in his own clients. He received bonuses every year of his employment and was universally praised by those he worked with across every evaluation cycle. He was recognized as a SuperLawyers "Rising

Star" and a "Best Lawyers in America: One to Watch" and appointed by the New Jersey Supreme Court to serve on the New Jersey District VII Ethics Committee. He was, in short, Partner material, and Troutman Partner Ron Raether ("Mr. Raether"), Head of Troutman's Privacy & Cyber practice group, told him so.

3. For years, Mr. Cali was working around the clock for Troutman and Partners took note. In fact, he was told in the summer of 2023 that if he performed well on a major FTC investigation response with Mr. Raether for a client, then he would likely be promoted the following year.

4. Then in or around November 2023, at the height of his career, Mr. Cali suffered a massive heart attack—a ST-elevation myocardial infarction, commonly known as a "widow-maker," with only a 10% chance of survival. He was working alone in the Firm office late at night when this happened but thankfully was able to get to a local hospital. While at the hospital, his heart stopped. He required emergency resuscitation and emergency surgery. He took the FMLA leave that his doctors required and returned to work on March 11, 2024, fully committed to resuming the path to Partnership that had been expressly promised to him.

5. But he was not welcomed back. Instead, he was punished. Within weeks of his return, Mr. Raether told him that, because of his medical leave, "the goalposts to make Partner" had been moved. What followed was a deliberate and systematic campaign of adverse employment actions designed to derail Mr. Cali's career and force him out of the Firm. He was stripped of substantive work and relegated to administrative "busy work" instead. He was denied supervising attorney credit and told it would not help him get promoted despite the Firm's own leadership confirming such credit was an important factor in Partnership and compensation decisions. He was excluded from client pitches, marketing campaigns and other career

development opportunities that were routinely offered to his even more junior colleagues. He was denied a bonus for 2024 despite meeting his billable hour targets. And, he was subjected to coordinated negative performance evaluations that were directly contradicted by flowing praise from other Partners in the same review cycle.

6. While working under these increasingly punitive conditions, Mr. Cali uncovered a systematic scheme of fraudulent billing orchestrated by his supervising Partners while working on a complex, multi-district litigation and related regulatory matters. These Partners directed the team to fabricate work not needed to advance the client's needs in litigation, bill unrelated non-litigation work to a litigation matter covered by insurance, and instruct junior associates to disguise the true nature of billed entries to evade scrutiny from the client's sophisticated insurer. The Partners gave specific instructions on how to craft billing narratives, as seen below, but notably did not say that the team should not be billing for certain activities—only that the narratives themselves had to be crafted in a specific way so as to not get flagged by the insurer.

> All,
>
> As previously mentioned, our telematics bills are under close scrutiny by the insurer. We need to ensure we do not have multiple attorneys billing for the same task. We accordingly prepared the attached chart with the current list of timekeepers and each person's primary role. If you are working on a project that is outside of the general categories defined in the attached, please let us know so we can update our chart and make certain we are not duplicating tasks. If someone is not on this list and appears on an invoice, their time will be written off. Approval by Ron or Julie is mandatory.
>
> Please also craft your billing narratives in a way that aligns with your defined role so we can hopefully avoid any write-offs. For example, if multiple people are researching for the motion to dismiss, it is not good enough for each person to just say research for motion to dismiss. Additionally, every entry must capture relevancy towards the defense against the claims in the MDL or raised by the regulators.
>
> **ATTENTION**: Do not assume that we will catch any incomplete or redundant entries. If the time is written off because of your poor entry, we will not appeal, and your realization rate will be adversely impacted. Please act accordingly.
>
> Please let us know if you have any questions.
>
> Thanks,
> Julie
>
> **Julie Diane Hoffmeister**
> **Partner**
> **troutman pepper locke**
> Direct: 804.697.1448
> julie.hoffmeister@troutman.com

7. Mr. Cali reported this fraud within the Firm, as the law and his ethical obligations required him to do. The Firm's response was to retaliate against Mr. Cali, a lawyer who had a literal heart attack working in its offices and was trying to protect the Firm from claims of fraudulent billing. His complaints were disregarded, and internal investigations unsurprisingly exonerated the Firm with no further explanation. Instead of addressing his legitimate grievances, the Firm, including through Audrey Wisotsky ("Ms. Wisotsky"), Vice Chair of the firmwide Associate Development Committee, escalated its adverse actions and threatened his continued employment. Ultimately, the Firm offered him a standard "transition package" and demanded he accept it within 48 hours—all in a futile effort to push him out of the Firm in a way that minimizes Defendants' liability for their unlawful conduct.

8. The Firm's conduct gives rise to claims under the FMLA, 29 U.S.C. §§ 2601 *et seq.*; the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*; and the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 *et seq.*[1]

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Mr. Cali's rights under the FMLA.

10. This Court has supplemental jurisdiction over Mr. Cali's state law claims pursuant to 28 U.S.C. § 1367.

11. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of New Jersey because a substantial part of the events or omissions giving rise to this action occurred here.

[1] After exhausting the administrative prerequisites, Mr. Cali intends to amend this complaint to include claims for violations of the Americans with Disabilities Act.

## PARTIES

12. Plaintiff Matthew Cali is a resident of the State of New Jersey. At all relevant times, Mr. Cali was an "employee" of Troutman under all applicable statutes.

13. Defendant Troutman Pepper Locke LLP has its principal place of business at 600 Peachtree Street, N.E., Suite 3000, Atlanta, Georgia 30308. It also maintains an office at 104 Carnegie Center Drive, Suite 203, Princeton, NJ 08540. At all relevant times, Troutman met the definition of an "employer" under all applicable statutes.

14. Defendant Ron Raether was Mr. Cali's supervisor during his employment and therefore participated in relevant employment decisions concerning him, as set forth below. Upon information and belief, Mr. Raether is a resident of the State of California. At all relevant times, Mr. Raether met the definition of "employer" under all applicable statutes.

15. Defendant Audrey Wisotsky was Mr. Cali's supervisor during his employment and therefore participated in relevant employment decisions concerning him, as set forth below. Upon information and belief, Ms. Wisotsky is a resident of the State of New Jersey. At all relevant times, Ms. Wisotsky met the definition of "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

### I. MR. CALI'S SUCCESSFUL CAREER

15. Mr. Cali graduated *cum laude* from Villanova University in 2011 with a Bachelor of Science in Mathematics and Mathematical Sciences and a minor degree in Chinese.

16. In 2014, Mr. Cali graduated from Villanova's Charles Widger School of Law, where he served as Editor-in-Chief of the Jeffrey S. Moorad Sports Law Journal, a member of the Honor Board, and was named Most Outstanding Staff Writer for 2012–2013.

17. Following graduation, he clerked for the Honorable Jamie S. Perri of the New Jersey State Superior Court, Monmouth Vicinage, where he developed deep expertise in New Jersey court practice and procedure.

18. Following his clerkship, Mr. Cali joined and spent two years as a commercial litigation associate at LeClair Ryan, after which he went in-house for a year at the Wyndham Hotel Group, an international hotel and resort chain.

19. While with Wyndham, Mr. Cali oversaw and managed the international and domestic franchise litigation docket, conducted internal fact investigations, and engaged with industry associations, lobbyists, and political leaders as a member of the company's government affairs team.

20. This in-house experience provided Mr. Cali with an invaluable client-side perspective that instilled in him the need to be transparent and highly ethical at all times in representing and communicating with clients.

21. On or around April 9, 2018, Mr. Cali joined Pepper Hamilton LLP[2] as a Health Sciences and Commercial Litigation Associate in Princeton, New Jersey.

22. From the outset, Mr. Cali proved himself to be a highly productive and skilled attorney.

23. His work spanned a wide range of complex commercial litigation matters, including franchise disputes, construction litigation, intellectual property matters, and class action defense. He eventually moved to the Business Litigation team.

---

[2] Troutman, as it exists today, is the result of the merging of several other firms: first Pepper Hamilton LLP and Troutman Sanders LLP merged in July 2020 to make Troutman Pepper Hamilton Sanders LLP. Then the Firm merged again with Locke Lord LLP in January 2025 to make Troutman Pepper Locke LLP.

24. Mr. Cali's superior performance and skill level were recognized instantly, and he was given significant responsibility early in his tenure, routinely taking party depositions, arguing numerous dispositive and discovery motions in state and federal courts, working with consulting and testifying experts, sitting second chair at trials and arbitrations, handling pro bono hearings and trials, and arguing an appeal before the First Department in New York.

25. He also developed business for Troutman and brought in his own clients.

26. Prior to his heart attack and identification of unlawful billing practices, Mr. Cali received bonuses in every single year of his employment. He was also appointed to the Firm's Associate Liaison Committee, served as both a formal and informal associate mentor, and was appointed to be a Firm Pro Bono Ambassador.

27. His performance was universally praised by Troutman Partners across offices and practice groups during every evaluation cycle. Their comments speak for themselves:

- "Matt exercises good judgment and has taken on a lot of responsibility . . . He has been the main point person on many occasions with experts, adversaries and clients." *(Stephanie Jonaitis, Senior Attorney, 2019)*

- "Matt has taken the 'laboring oar' in a series of cases . . . Matt's ability to take the lead on so much of the defense allows us to provide top-notch work to our clients in a cost-effective manner." *(Elizabeth Reilly-Hodes, Senior Attorney, 2019)*

- "His substantive work—particularly in handling depositions—has been very strong. And Matt has shown exceptional judgment in some very tough situations." *(Sara Richman, Partner, 2019)*

- "Matt is incredibly dependable and can balance a lot of spinning plates. Those plates are full and, on my cases, I never have to worry that something is going to be dropped." *(Jeff Carr, Partner, 2020)*

- “He is ALWAYS on top of things in our 50+ cases pending in NJ state court. I never worry that anything is getting overlooked. He has made himself indispensable on these matters.” *(Sara Richman, Partner, 2020)*

- “His research and writing (motions, appellate briefs) is excellent requiring very little, if any, editing or changes.” *(Frank Cara, Partner, 2021)*

- “He took complete ownership of the matter, takes a great deal of initiative and is a great team player.” *(Noel Ix, Partner, 2021)*

- “Matt is incredibly self-sufficient and capable . . . He is on point, responsive, and asks appropriate questions . . . the clients reach out for Matt directly.” *(Jeff Carr, Partner, 2021)*

- “He performs partner quality work and I'm sure the best is yet to come.” *(Vincent Torna, Counsel, 2021)*

- The Associate Development Committee recognized in its 2021 evaluation summary that “many partners rely on Matt as the lead lawyer for their New Jersey litigation matters,” that he is “trusted to handle cases from beginning to end with little oversight,” that he “produces high quality work and consistently meets deadlines," and that "clients call him with more work and referral[s].” *(ADC Evaluation Memo, 2021)*

- The Associate Development Committee’s 2022 evaluation summary noted that multiple reviewers lauded his “can-do attitude, calm demeanor, ownership of matters, and substantive contributions,” as well as his “thoughtful analysis of issues, responsiveness, and ability to work independently.” *(ADC Evaluation Memo, 2022)*

- “Matt is extremely thorough in his work product. I never question whether any stone was left unturned—i.e., when I get a research answer from Matt, I know he ran down every angle and I have no doubt that his analysis is thorough and complete.” *(Julie Hoffmeister Smith, Partner, 2023)*

- "Matt continues to impress with his knowledge of the law and his strong work ethic. Matt is extremely intelligent and quickly comprehends issues." *(Vincent Torna, Counsel, 2023)*

- "Matt has become a key member of the privacy + cyber team . . . Matt [dove] in with both feet and shows great promise for the future." *(Joshua Davey, Partner, 2023)*

28. Mr. Cali's excellence was also recognized outside the Firm. He has repeatedly been named a SuperLawyers "Rising Star" by his peers and has been named to "Best Lawyers: Ones to Watch" for Commercial Litigation and Litigation – Construction every year since 2023.

29. The New Jersey Supreme Court even appointed him to serve on the New Jersey District VII Ethics Committee.

30. His work there was of such high caliber that the Chair of the Committee once wrote that Mr. Cali's investigation report was "one of the most thoughtful and conscientious investigative reports I have ever read."

31. Around the end of 2022, Partner Angelo Stio ("Mr. Stio") approached Mr. Cali and suggested that he transition to the Firm's newly formed Privacy & Cyber practice group.

32. Mr. Stio expressly advised Mr. Cali that the new group was bringing in top attorneys with relevant experience from other groups, and that joining a specialized practice group would help him make Partner himself.

33. After interviewing, Mr. Cali was welcomed into the new practice group with open arms. From there, Mr. Cali continued to excel.

34. In or around the fall of 2023, Partner Cindy Hanson ("Ms. Hanson") entrusted Mr. Cali with leading the Firm's response to a Federal Trade Commission ("FTC") Civil Investigative Demand for a big client (the "FTC Matter").

35. Ms. Hanson told Mr. Cali that through this role he would have direct exposure to Mr. Raether, a Partner and the Head of the Privacy & Cyber practice group, and that if Mr. Cali performed well on the matter, he would make Partner. She also advised Mr. Cali to remove himself from other matters and to dedicate himself fully to the assignment, which he did.

## II. MR. CALI SUFFERS A MASSIVE HEART ATTACK

36. On or around November 6, 2023, Mr. Cali was working on the FTC Matter late into the night alone at the office in Princeton when he suffered a massive heart attack.

37. He managed to make it home to his wife, who rushed him to the hospital as his condition rapidly deteriorated.

38. Later that night, Mr. Cali's heart stopped, and he required emergency resuscitation and emergency surgery.

39. Mr. Cali had experienced a ST-elevation myocardial infarction (known as a "widow-maker"), one of the most serious types of heart attacks with only a 10% chance of survival. His bloodwork and medical imaging confirmed the severity of the long-term damage to his heart.

40. After his heart attack, a portion of his heart was akinetic and had stopped working.

41. It was clear that Mr. Cali would require an extended period of medical leave for rest, rehabilitation and recovery.

42. He notified the Firm's Human Resources ("HR") department of his condition and emergency surgery and initiated the necessary paperwork for FMLA leave.

43. Over the next four months, Mr. Cali underwent extensive cardiac rehabilitation and worked closely with his cardiologists to manage his condition.

44. During this time, he was twice rushed to the emergency room after his cardiac team suspected he was having yet another heart attack during rehabilitative therapy sessions.

45. He also suffered a setback in or around January 2024, when his lengthy medication list caused an uncontrollable duodenal ulcer requiring another emergency procedure and a five-day stay at the hospital.

46. He now lives with a permanent cardiac condition requiring lifelong medication and monitoring and causing significant stress on Mr. Cali and his family.

47. On or around March 11, 2024, after receiving clearance from his doctors, Mr. Cali returned to work.

48. He was ready to resume his duties and continue on the Partnership track that had been outlined for him.

49. He certainly never imagined that the Firm would be callous enough to actually punish him for having a heart attack and taking medically-needed leave.

50. However, as described below, the Firm's treatment of Mr. Cali changed dramatically the moment he walked back through its doors.

## III. THE "GOALPOSTS" MOVE AFTER MR. CALI'S MEDICAL LEAVE

51. Upon Mr. Cali's return to work, the adverse treatment began almost immediately. Within weeks of his return, Ms. Wisotsky, Co-Chair of the Firm's Associate Development Committee ("ADC"), met with Mr. Cali and recommended that he work part-time following his heart attack. For an associate who had worked tirelessly toward Partnership and was ready to dive back into the FTC Matter, which he was told would make him a Partner, being steered toward a reduced schedule was an ominous sign.

52. Then on or around April 16, 2024, Mr. Cali had his first call with Mr. Raether since returning from medical leave.

53. Mr. Raether informed Mr. Cali that he had become his new mentor—a role Mr. Raether evidently did not take seriously.

54. The call's tone was set from the outset: when Mr. Cali asked how Mr. Raether was doing, Mr. Raether said he had been "getting into trouble" and described himself as someone who "is not a rule follower and tries to bend the rules around what he wants to do to try to get away with things."

55. Mr. Raether then told Mr. Cali that because of his heart attack and the time spent recovering, "the goalposts to make Partner" had been moved.

56. Mr. Raether offered no explanation for how a medical emergency changed the Partnership calculus, but this clearly constituted an admission of unlawful animus.

57. Mr. Cali later sought explanations from multiple other Partners and associates in the Princeton office, and no one could offer a coherent reason why a heart attack would affect the criteria for Partnership.

58. Mr. Cali asked Mr. Raether if they could continue these mentoring calls on a regular basis, and Mr. Raether said no and joked about how his secretary (whose name he apparently did not even know) could not keep up with his busy schedule.

59. He then ended the call. For Mr. Cali, the message was unmistakable: his necessary medical leave had cost him dearly.

60. What followed was a systematic campaign of adverse employment actions designed to derail Mr. Cali's career and force him out of the Firm.

61. On or around July 1, 2024, Mr. Cali was assigned to the Firm's representation of Client A in a large multi-district litigation and related state regulatory investigations arising from claims concerning its collection and use of certain consumer data (the "Client A Case").

62. The case was staffed with a team of eight to ten associates and multiple Partners, including Mr. Raether, Ms. Hanson, and Partner Julie Hoffmeister Smith ("Ms. Hoffmeister Smith").

63. Despite his seniority and experience, Mr. Cali was assigned the role of Project Manager—keeping track of action items and taking notes on phone calls—rather than being given the substantive, senior-level work he had excelled at throughout his career at Troutman.

64. Before his heart attack, Mr. Cali had driven litigation strategy, handled drafting, and made court appearances on major matters.

65. After his return, the Firm ensured that no such opportunities came his way.

66. Even as Mr. Cali tried to make strategy suggestions and take ownership of his aspects of the Client A Case, he was ignored and given "busy work."

67. What's more, many of the other associates on the case were removed from the team or left the Firm entirely and were never replaced, making even more "busy work" for Mr. Cali to complete as he now had to handle work typically assigned to a junior associate due to lack of staffing.

68. The adverse actions extended to Mr. Cali's compensation and advancement. At his end of year review in December 2024 with Mr. Raether and Puja Patel Lea ("Ms. Patel Lea"), Partner, Mr. Cali expressed his concern and disappointment about not receiving a raise for 2025.

69. Mr. Raether promised to put him in a more senior role on higher paying cases in order to bolster his economic profile and case for Partnership and specifically reassured Mr. Cali that he was on track to be put up for Partner in 2026.

70. Mr. Cali would eventually learn how empty these promises really were.

71. On or around February 28, 2025, Mr. Cali learned he would not receive a bonus for 2024, despite hitting his billable hour targets and meeting all the other requirements.

72. On or around March 6, 2025, Ms. Wisotsky told him his “economic profile” did not warrant a raise or bonus and that he needed to “make a decision” about whether to stay at the Firm, in part because he did not generate a certain multiple of his base salary in collections.

73. This was preposterous for three reasons: (1) Mr. Cali had suffered a heart attack and taken significant time off in the prior year; (2) Mr. Cali still easily met the billable hour threshold for 2024 when pro-rated to account for his medical leave; and (3) bringing in a certain multiple of base salary was not a listed requirement for receiving a bonus or raise within the Firm’s own policies and is not within an associate’s control.

74. The Firm's characterization of his “economic profile” as insufficient to justify a raise or bonus was flatly contradicted by his own financial performance metrics.

75. Mr. Cali continued to express his frustrations to his mentor, Mr. Raether.

76. Mr. Cali told him that he felt that the Firm was not investing in his future. Mr. Raether merely told Mr. Cali to “trust him.”

77. On or around March 29, 2025, Mr. Raether sent Mr. Cali a $3,000 Zelle payment directly to his personal bank account and told him he was “putting his money where his mouth was” and was committed to nominating Mr. Cali for Partner in 2026.

78. Mr. Raether specifically instructed Mr. Cali not to tell anyone about the payment, showing that Mr. Raether knew it was inappropriate.

79. To conceal the nature of the transaction, Mr. Raether disguised the Zelle payment with the memo line "Hope this helps with the cabinets," a bizarre cover story for what was, in fact, an off-the-books payment from a supervising Partner to a subordinate associate.

80. The payment lays bare the central contradiction of Mr. Cali's experience at the Firm following his heart attack: on one hand, Firm leadership told Mr. Cali that his "economic profile" did not justify compensation and that he should consider leaving Troutman altogether. On the other hand, the very Partner responsible for evaluating his work made a secret payment from his own personal funds to keep him engaged and working on the Client A Case, which would have clearly collapsed without Mr. Cali.

81. Mr. Raether's conduct reveals that he knew Mr. Cali had been wrongly denied compensation and that Mr. Cali's continued labor on a matter that ultimately generated over $7 million in fees for the Firm was of personal importance to Mr. Raether himself.

82. The Firm also systematically denied Mr. Cali the professional recognition his work earned.

83. Despite serving as the lead and supervising associate on the Client A Case, Mr. Cali was never permitted to file a notice of appearance in the matter.

84. It is obvious that this was a calculated denial of the professional visibility that accompanies meaningful participation in significant litigation.

85. Instead, Mr. Cali continued to be assigned to support other associates who were more junior than he was with their lower-level work, rather than being assigned substantive work

of his own. This was in direct contradiction to the promise that Mr. Raether made to Mr. Cali that Mr. Cali would be assigned more senior roles on higher paying matters.

86. Throughout 2024 and 2025, Mr. Cali supervised associate work on the Client A Case but, due to a dwindling associate team, had to complete many of the projects and assignments himself to ensure all projects and assignments given by the Partners were completed. So far, he has billed more than 3,000 hours to the matter—more than any other attorney by several hundred hours, yet he was repeatedly denied Supervising Attorney credit. Instead, that credit was confoundingly given to another associate, Derek Schwahn ("Mr. Schwahn"), who had billed only 4.5 hours to the case.

87. Similarly, on a related state Attorney General matter, Mr. Schwahn received Supervising Attorney credit despite billing zero hours, while Mr. Cali actually worked on the matter, supervised another associate, and billed 180.8 hours—the most of any attorney on the file.

88. When Mr. Cali repeatedly requested this credit from Mr. Raether, Ms. Hanson, and Ms. Hoffmeister Smith throughout 2024 and 2025, he was falsely told that Supervising Attorney credit had no impact on Partnership consideration or compensation, so he did not need to worry about it.

89. Mr. Cali ultimately learned the truth on his own by asking colleagues in his office and outside of the group.

90. Indeed, one Partner told Mr. Cali that Mr. Raether, Ms. Hanson, and Ms. Hoffmeister Smith's explanation was "bullshit." Mr. Cali also listened to "The Current," a podcast hosted by Troutman Chair Tom Cole ("Mr. Cole"), who addressed topics relevant to

associates on the Partnership track, including the mechanics of how Partnership and compensation decisions are made.

91. On an episode of the podcast released in or around November 2025, Mr. Cole and his guest stated that that attorney credit, including Supervising Attorney credit, was in fact an important factor in those very decisions at the Firm.

92. After hearing this episode, Mr. Cali raised the issue again with Ms. Hanson on or around November 17, 2025. She continued to insist the credit was unimportant to Mr. Cali's progression at the firm.

93. Mr. Cali was also systematically excluded from the career development opportunities regularly provided to other associates.

94. Despite repeatedly expressing his desire to participate in client pitches in mentor meetings with Mr. Raether and Ms. Hanson and in his Five-Year Plan presented to practice group leadership, Mr. Cali was not invited to assist with any pitches, while other associates were routinely invited.

95. Similarly, Mr. Cali was excluded from practice group marketing campaigns, including a campaign about data brokers (which applied to nearly all of Mr. Cali's work).

96. In or around January 2025, when Partners initiated a "marketing team" for the subject matter of the Client A Case, Mr. Raether added only Ms. Hanson and Ms. Hoffmeister Smith to the team email thread, deliberately excluding Mr. Cali despite his months of intensive work on the Client A Case.

97. After Ms. Hoffmeister Smith added Mr. Cali to the email thread, Mr. Raether cautioned against publishing anything related to the case, effectively preventing any marketing for the subject matter of the Client A Case from occurring.

98. In or around October 2025, Mr. Raether, Ms. Hanson, and Ms. Hoffmeister Smith each submitted conspicuously coordinated negative evaluations that were both inconsistent with Mr. Cali's actual performance and contradicted by the other positive evaluations he received for the same year, including:

- "Matt did a great job shepherding this thorny project through some difficult litigation issues that are outside my bailiwick."
- "His work was in all respects akin to that of a litigation partner."
- "I have been very impressed with Matt. He is diligent, organized, and has done a nice job owning many aspects of [the Client A] Case."
- "Matt is consistently on top of the [Client A Case] workload and works long hours to ensure completion of all projects."
- "Matt took accountability and responsibility in every case . . . and did a great job."
- "Many litigation Partners admitted in NJ do not know state court practice as well as Matt does."

99. In spite of these glowing remarks, on or around January 14, 2026, before his formal evaluation conference, Ms. Wisotsky told Mr. Cali that his evaluations were "very bad" for a senior associate seeking promotion and suggested that he inquire about a Counsel role rather than Partnership during his evaluation.

100. On or around January 21, 2026, Mr. Cali had his evaluation conference with Mr. Raether, Ms. Patel Lea, and Breanne Osborne.

101. Mr. Raether informed Mr. Cali he would not be nominated for Partnership, citing that Mr. Cali had an "associate mentality" and did too much associate work.

102. Mr. Cali explained that the Client A Case team had shrunk from nine associates down to just two and therefore he was forced to perform associate-level work despite his repeated requests for additional support throughout the year.

103. Despite receiving emails and discussing this issue with Mr. Cali during the year, Mr. Raether denied ever knowing that Mr. Cali had requested additional associate support on the Client A Case.

104. Then Mr. Raether openly admitted that he "made up" a significant amount of associate work for Mr. Cali to do on the Client A Case, meaning that Mr. Cali had been assigned fictitious work with no material litigation purpose so it could be billed to the client.

105. It also meant that the very work he was now being criticized for performing was work that Mr. Raether himself had fabricated.

106. Mr. Raether further noted that Mr. Cali could not be promoted to Partner because there were apparently already too many Partners working on the Client A Case.[3]

107. At the close of the evaluation conference, Mr. Raether offered Mr. Cali the opportunity to remain at the Firm in a Counsel role within the Privacy & Cyber group and suggested they schedule a follow-up call to discuss what that role would look like.

108. As Mr. Cali would later learn, this was another one of Mr. Raether's fabrications.

## IV. MR. CALI WITNESSES FRAUDULENT BILLING PRACTICES

109. During Mr. Cali's work on the Client A Case, he became aware of systematic and troubling billing practices orchestrated by Mr. Raether, Ms. Hanson and Ms. Hoffmeister Smith.

110. To understand the scope of this misconduct, some context is necessary.

111. Upon information and belief, the claims made in the Client A Case were covered under one of Client A's insurance policies issued by Beazley Insurance ("Beazley"), a leading cyber-liability insurer that served as Client A's carrier for the litigation.

---

[3] This turned out to be yet another lie because, just a couple months later, two new Partners were added to the Client A Case team. Given these partners' lack of experience with the subject matter of the case, they have frequently deferred to Mr. Cali on numerous items related to litigation strategy.

112. While Beazley agreed to cover the costs associated with defending the Client A Case, upon information and belief, Client A had to pay a retention amount before Beazley's obligation to pay defense costs was triggered.

113. However, upon information and belief, Troutman had reached an agreement with Beazley and Client A that Beazley would review all legal bills related to the Client Case litigation and had the right to audit and contest charges before the bills would be sent to Client A for payment, up to the retention amount.

114. Once the retention amount threshold was breached, Beazley's coverage obligation would be triggered.

115. It is against this backdrop (a sophisticated insurer scrutinizing every invoice) that the Firm's Partners directed the team to fabricate work, bill unrelated non-litigation matters to the litigation file and attempt to carefully disguise billing entries.

116. These practices were not merely isolated judgment calls but a coordinated pattern of fraudulent billing designed to maximize Firm revenue at the expense of the client and its insurer by charging for work that was fabricated, unnecessary or entirely unrelated to the litigation at hand. Put plainly, these practices amount to systematic theft.

117. The following is a non-exhaustive account of some of the misconduct Mr. Cali witnessed and documented.

- **July 2024**: Ms. Hoffmeister Smith, the Billing Attorney for the Client A Case, circulates a billing instruction email to the Client A Case team laying out rules designed to obscure the nature of the work being billed. The email instructs: "The client will not pay for internal meetings and discussions. So, none of your narratives should reference other Troutman attorneys." These instructions, which were issued before a single invoice has been contested, establish, from the outset, a protocol designed not to comply with

billing guidelines but to disguise the true nature of the work being charged.

- **September 2024**: In a different matter (the "Client B Case") in which Beazley was also the client's insurer, Mr. Raether sends Beazley a detailed letter acknowledging improper billing practices and outright admitting that "exceptions to Beazley's policies were not requested and obtained," that the team did "not follow[] Beazley's billing guidelines," that certain items were "not agreed to by the insured . . . or possibly did not comply with Beazley's billing rules," that certain entries "should not be billed" such as lobbying work, and that the Firm was still "developing a solution for past invoices." He apologized and cut over $65,000 in unauthorized billing after being essentially caught by Beazley.

> Invoice Adjustments Proposal: Thus, the total reduction we are proposing is an additional $65,933,25. This discount is above the money I wrote off across all eleven clients that never appeared on a Beazley insured invoice.
> As mentioned below, we value the Beazley relationship. I hope the additional, substantial reduction in invoices acknowledge this point. Indeed, I do not plan to invoice separately the insured for the items in bucket b that relate to compliance work the client requested of us (even though we have long standing relationships with these clients).
> Going Forward: That said, as we discussed previously, it took us several months to develop a billing process that achieved fairness across all eleven clients and complied with the various rules imposed by each client. We apologize for not getting this perfected before invoices were sent to Beazley. We continue to improve this process and hope that going forward we will not see any similar issues. If you do, please reach out to me immediately.
> We value open and candid dialogue. I would be happy to schedule another call if needed. Otherwise, if acceptable, let me know what you require to process these invoices for payment.
> **Ronald I. Raether, Jr., CIPP/US**
> **Partner**
> **troutman pepper**
> Direct: 949.622.2722 | Internal: 18-2722
> ron.raether@troutman.com

- **October 2024**: Mr. Raether sends another email to the team acknowledging that Beazley had raised concerns about the type of work being billed to Beazley and its insureds. Despite these repeated admissions and apologies, the problematic billing practices continue unabated in other matters, including both the Client A Case and the Client B Case.

- **Throughout 2024-2025**: Mr. Cali observes multiple workflows entirely unrelated to the pending litigation are intentionally billed to the Client A Case litigation file. These include: (1) lobbying work related to proposed state legislation on insurance carriers' handling

of the consumer data; (2) advising on and eventually negotiating terms of contractual agreements with an original equipment manufacturer and its counsel (neither a party to the litigation); and (3) compliance work on new client products not at issue in the litigation. When Mr. Cali questions this practice, Ms. Hoffmeister Smith explicitly instructs him to "make the time entry sound 'litigation related'" even when the work has nothing to do with the litigation. Mr. Cali reports this to other Partners in the office and his practice group, including Mr. Stio.

- **February 2025**: Ms. Hoffmeister Smith sends another email to the Client A Case team instructing them to "improve their billing narratives." She says, "We cannot reference internal meetings or identify other Troutman lawyers who may be on a larger group call" and "you should not reference direction given by other Troutman lawyers in your narrative." Importantly, Ms. Hoffmeister Smith does not say that the team cannot bill for these types of work, just that the bills to Beazley cannot reflect it. She warns, "These bills are under close scrutiny. We need to follow these rules to make sure our time is not written off." See *supra* at Paragraph 5.

- **March 2025**: Ms. Hoffmeister Smith sends a follow-up email reiterating that "[o]ur [Client A] bills are under close scrutiny by the insurer." She instructs the team to "craft your billing narratives in a way that aligns with your defined role" and that "every entry must capture relevancy towards the defense against the claims in the MDL or raised by the regulators." She explains this in subsequent team calls and meetings by advising that, if not obvious, each time entry should include a phrase, "for the purpose of" and then an attempt to relate the work to the litigation.

- **November 2025**: Ms. Hoffmeister Smith instructs Mr. Cali to re-format a completed summary of the client's data team's search parameters. The data team had spent nearly five months perfecting data searches and constantly adjusting the search parameters. After providing work product that summarized the final search parameters used in the data team's search as the client requested, Ms. Hoffmeister Smith then demands that Mr. Cali include a detailed history of the previous search parameters that were not used for the final search and were stale after the data team determined those

parameters would not accomplish the goals of the search. This requires Mr. Cali to search through nearly five months of email exchanges to compile a much larger analysis of searches that were stale and outdated. When Mr. Cali questions whether this additional work is necessary given that the client requested only the final parameters, Ms. Hoffmeister Smith told him, "No one is going to look at this — just do it." The expanded document is sent to the client but is never mentioned on any subsequent client call.

- **November-December 2025**: Mr. Cali raises concerns with Ms. Hoffmeister Smith about a proposed assignment to draft an Opposition to a hypothetical motion to compel, noting that defense counsel had advised that opposing counsel "likes to threaten filing motions to compel, but usually did not file them." Still, Ms. Hoffmeister Smith directs him to prepare a complete opposition brief to the hypothetical motion, including client and attorney affidavits and a memorandum of law without there being a filed motion requiring a response. The Opposition is never circulated to the client, and no motion to compel was ever filed. Even Dustin Taylor, a recently hired Counsel who was asked to assist Mr. Cali because of the lack of associate support on the Client A Case, questioned why they are preparing an opposition to a motion that has not been filed and expressed confusion about whether this is standard practice in the group.

- **December 2025-January 2026**: Mr. Cali is directed to prepare extensive Discovery Questions and Discovery Plan documents for the Client A Case. He drafts and shares the document with Ms. Hoffmeister Smith, who provides comments. Mr. Cali makes the necessary revisions, but Ms. Hoffmeister Smith never reviews the document again. It is never used or even shared with the client, and yet the hours spent drafting and revising it are billed to the litigation matter. This was just one of many documents that associates were asked to create, even knowing that they would likely not be used in the litigation.

- **January 2026**: During Mr. Cali's evaluation conference, Mr. Raether openly admits that he "made up" a significant amount of work for Mr. Cali to do on the Client A Case in 2025. This confirms what Mr. Cali had long suspected: that partners were creating busy

work solely to generate billable hours during a slower period in the case when discovery had not yet commenced and motions to dismiss were pending, without regard to whether the work served any legitimate purpose for the client.

- **March 2026**: After Mr. Cali drafts work product related to the continued negotiation of a contract with an original equipment manufacturer not involved in the Client A Case at the direction of the client, Ms. Hoffmeister Smith emails Mr. Raether to ask him how to edit an email about the work product to their client "since this advice is not directly related to the litigation," essentially asking how to tie non-litigation work to the litigation in order to be able to bill the client for it.

> Ron – I'm not certain how to edit this email in light of our recent conversations with the client since this advice is not directly connected to the litigation. See my proposed edits in red below. Would appreciate your confirmation before we send to Nancy.
>
> **Julie Diane Hoffmeister**
> **Partner**
> **troutman pepper locke**
> Direct: 804.697.1448
> julie.smith@troutman.com

118. Taken together, these practices represent a systematic scheme in which the Firm's most senior Partners on the Client A Case billed hundreds of thousands, if not millions, of dollars to the client and its insurer for work that was fabricated, unnecessary or entirely unrelated to the litigation at hand.

119. This represents a deliberate and sustained effort to deceive and successfully steal from the client and its insurer.

## V. MR. CALI REPORTS THE FRAUD AND FACES INCREASED RETALIATION

120. In or around May 2025, Mr. Cali attended the Barbara Johnson Memorial Golf Outing hosted by the South Jersey Claims Association. He was invited as a guest of an expert he had used in previous matters. There, he met a cyber claims manager who worked for Beazley.

121. Upon hearing that Mr. Cali was an attorney at Troutman, this claims manager said that Troutman is "known at Beazley" for doing work on cases that does not actually need to be done.

122. This was alarming for Mr. Cali to hear, and in the following days, Mr. Cali reported this conversation to two separate Troutman Partners, Mr. Stio and Ms. Hoffmeister Smith.

123. They each separately asked if he had told Mr. Raether about the conversation yet.

124. Mr. Cali replied that he had not but that he agreed with the Beazley claims manager's statement because he had seen work being billed to the Client A Case that he did not believe was necessary to advance the client's interests or related to the litigation.

125. He specifically identified the (1) lobbying work related to proposed state legislation on insurance carriers' handling of the consumer data; (2) negotiating contractual agreements with an original equipment manufacturer not party to the litigation; and (3) compliance work on new client products not at issue in the litigation.

126. Neither partner moved to investigate or address these serious concerns. Instead, they both revealed that their primary concern was controlling information.

127. Rather than ensuring proper reporting up the chain of command, Mr. Stio and Ms. Hoffmeister Smith were instead focused on whether Mr. Raether was already aware of the Beazley claims manager's comment and (to the extent he was not) what steps might be needed to contain that information from him and others.

128. Throughout the summer and fall of 2025, as Mr. Cali was assigned increasing amounts of questionable work, he continued to question the purpose behind some of the work he was assigned and its relevance and bearing on the Client A Case.

129. Then, on or around January 23, 2026, following his evaluation conference, Mr. Cali called Ms. Patel Lea to raise concerns about multiple inaccuracies and false statements in his written evaluation and the comments Mr. Raether made at his evaluation conference.

130. He explained that the three negative written evaluations contradicted both his documented performance and statements made during the evaluation conference itself.[4]

131. He specifically objected to the following claims: (1) that he did not write or publish any articles when he had in fact written three; (2) that he did not offer strategic opinions when he regularly did so in weekly team calls and emails; and (3) that he did not handle action items when he in fact managed extensive case task lists, including for the Client A Case.

132. Ms. Patel Lea did not dispute Mr. Cali's account. She told him the best course was for her to document the issues he raised in a post-evaluation memo and that she would discuss with the ADC how he could supplement his file.

133. On or around February 5, 2026, Mr. Cali met with Mr. Raether and Ms. Hanson to discuss what a Counsel role in the Privacy & Cyber group could look like for him, as Mr. Raether had suggested during the evaluation conference.

134. When Mr. Cali asked what his responsibilities as Counsel would be, Mr. Raether admitted he had no information about what the role would entail and suggested multiple times during the call that Mr. Cali should consider leaving the Firm instead.

135. The fact that Mr. Raether offered the Counsel role to Mr. Cali, only to disclaim any knowledge of its substance two weeks later while urging Mr. Cali to leave the Firm, confirmed that the offer was never genuine. It was just another tool to manage Mr. Cali out of

[4] Partner evaluations for Mr. Cali were due in October 2025. Thus, only a few short months after reporting the fraudulent billing scheme, Mr. Raether, Ms. Hanson, and Ms. Hoffmeister Smith submitted their coordinated negative evaluations.

Troutman without openly terminating him.

136. On or around February 9, 2026, Mr. Cali summoned the courage to report his experiences at Troutman to Bennet Moskowitz ("Mr. Moskowitz") from the General Counsel's office.

137. Though he was fearful of further retaliation, he wanted to do the right thing and that was to report the discriminatory and retaliatory treatment he had experienced following his heart attack and medical leave, the billing fraud, and the retaliation he had experienced for raising concerns about that fraud.

138. He explained to Mr. Moskowitz the pattern of fabricated work, the inappropriate billing of unrelated non-litigation work to the litigation file, and how these practices had been used as a pretext to deny him Partnership.

139. He also described how his career had been systematically derailed since his return from medical leave.

140. Mr. Moskowitz acknowledged the seriousness of the allegations, said he was glad that Mr. Cali had come to him with all this information and added that this was not the first issue that the Firm had with Mr. Raether.

141. He further promised to loop in Jaime Theriot ("Ms. Theriot"), General Counsel, on the details that Mr. Cali had shared.

142. The Firm responded to Mr. Cali's disclosures to Mr. Moskowitz by conducting two separate investigations that both unsurprisingly exonerated the Firm.

143. In fact, rather than properly addressing Mr. Cali's legitimate complaints, the Firm escalated its adverse actions and even admitted to engaging in the complained-of misconduct.

144. On or around February 13, 2026, Mr. Cali sent a comprehensive email to Ms. Patel Lea outlining the evaluation inaccuracies.

145. Days later, Ms. Wisotsky called to tell him that the post-evaluation memorandum was delayed.

146. She then suggested that Mr. Cali meet with the Troutman coaching team to discuss potential job opportunities outside of the Firm.

147. This was yet another blatant attempt to push Mr. Cali to leave Troutman voluntarily, so that the Firm would not have to retaliatorily fire him.

148. Then Ms. Hanson publicly reprimanded Mr. Cali in front of other Partners for work performed by associates under Ms. Hoffmeister Smith's direct supervision—work in which Mr. Cali had no involvement.

149. On client calls, Mr. Raether and Ms. Hanson began consistently interrupting and talking over Mr. Cali when he attempted to provide strategic input.

150. Most egregiously, Ms. Wisotsky called Mr. Cali into her office and explicitly told him to stop pushing the issues he had raised "for [his] own good."

151. She warned that Mr. Raether had a lot of sway in practice group promotions and that if Mr. Cali continued pressing to have Mr. Raether's admission about fabricating work memorialized in his evaluation file, it would not be helpful for Mr. Cali's career at Troutman.

152. When Mr. Cali pushed back, Ms. Wisotsky responded that evaluation memos do not always reflect what was actually said verbatim during the conferences.

153. It was clear that the Firm's priority was protecting the Partners involved in the misconduct rather than addressing Mr. Cali's legitimate complaints about discrimination, retaliation, and fraudulent billing.

154. The cumulative effect of these actions was the complete derailment of Mr. Cali's Partnership trajectory and the destruction of his professional standing at the Firm.

155. Prior to his health issues, leave, complaints, and whistleblowing activity, Mr. Cali was explicitly told that successful performance would lead to Partnership.

156. So, he consistently exceeded expectations, brought in clients, met all bonus requirements and worked on matters that generated tremendous revenue for the Firm, all the while receiving outstanding feedback in his formal reviews and informal conversations.

157. But all of that effort just resulted in Mr. Cali receiving little or no raise or bonus, being denied the professional credit his work merited, being systematically excluded from career development opportunities, receiving fabricated negative evaluations and ultimately being told by multiple Partners and Firm leadership that he would no longer make Partner and should leave the Firm.

158. The Firm continues its retaliatory conduct with each passing day.

159. On May 13, 2026, Kalle Covert ("Ms. Covert"), Director of Professional Development, unexpectedly called Mr. Cali and told him that, based on the statements he made during the investigations (which Mr. Cali had assumed were confidential), the Firm understood that he was "having difficulty" working directly with the Partners within his practice group.

160. Ms. Covert went on to acknowledge Mr. Cali's concern, which he shared with the investigator, that if the Firm transferred him to another group, he would end up being terminated (obviously, in retaliation for his protected activity).

161. As such, Ms. Covert suggested that Mr. Cali consider a "transition package" akin to a severance the Firm typically offers to fired employees to leave the Firm. What is more, she demanded that Mr. Cali make a decision with respect to a transition package within 48 hours.

162. In other words, in direct response to Mr. Cali's protected activity, instead of taking appropriate remedial steps the Firm has: (i) accused *him* of having difficulty working with the individuals who are engaged in unlawful conduct; (ii) threatened that he would be fired in short order; (iii) "suggested" that he consider a transition package; and (iv) pressured him to accept this fate within 48 hours so that Troutman can avoid liability for its unlawful actions. This was a clear and brazen act of retaliation.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of FMLA)**
***Against All Defendants***

163. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

164. By the actions described above, Defendants retaliated against Mr. Cali in violation of the FMLA because he exercised his FMLA rights, including but not limited to denying him equal terms and conditions of employment.

165. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Cali has suffered, and continues to suffer, economic and noneconomic injury for which he is entitled to monetary and other damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

166. Defendants' unlawful actions entitle Mr. Cali to all other damages available under the FMLA, including but not limited to liquidated damages and recovery of reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**(Interference in Violation of FMLA)**
***Against All Defendants***

167. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

168. By the actions described above, Defendants interfered with Mr. Cali's rights in violation of the FMLA by failing to reinstatement him to the same position (or a substantially similar position), with the same (or substantially similar) career opportunities upon his return from FMLA leave.

169. As a direct and proximate result of Defendants' unlawful interference, Mr. Cali has suffered, and continues to suffer, economic and noneconomic injury for which he is entitled to monetary and other damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

170. Defendants' unlawful actions entitle Mr. Cali to all other damages available under the FMLA, including but not limited to liquidated damages and recovery of reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the New Jersey Law Against Discrimination)**
***Against All Defendants***

171. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

172. By the actions described above, Defendants discriminated against Mr. Cali in violation of the NJLAD because of his disability status, including but not limited to denying him equal terms and conditions of employment.

173. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Mr. Cali has suffered, and continues to suffer, economic and noneconomic injury for which he is entitled to monetary and other damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

174. Plaintiff is further entitled to an award of punitive damages, as Defendants' conduct was and remains reckless, wanton, malicious and/or willful.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the New Jersey Law Against Discrimination)**
***Against All Defendants***

175. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

176. By the actions described above, Defendants retaliated against Mr. Cali in violation of the NJLAD because he complained about unlawful discrimination, including but not limited to denying him equal terms and conditions of employment.

177. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Cali has suffered, and continues to suffer, economic and noneconomic injury for which he is entitled to monetary and other damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

178. Plaintiff is further entitled to an award of punitive damages, as Defendants' conduct was and remains reckless, wanton, malicious and/or willful.

**FIFTH CAUSE OF ACTION**
**(Retaliation in Violation of the New Jersey Conscientious Employee Protection Act)**
***Against All Defendants***

179. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

180. By the actions described above, Defendants retaliated against Mr. Cali in violation of NJCEPA because he raised concerns about unlawful and fraudulent activity that he reasonably believed that Defendants were engaging in, including but not limited to denying him equal terms and conditions of employment.

181. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Cali has suffered, and continues to suffer, economic and noneconomic injury for which he is entitled to monetary and other damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

182. Plaintiff is further entitled to an award of punitive damages, as Defendants' conduct was and remains reckless, wanton, malicious and/or willful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions of Defendants complained of herein violated the laws of the United States and the State of New Jersey;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D. An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

E. Reinstatement and/or promotion to the position (with equivalent compensation and career opportunities) Mr. Cali would have held but for the unlawful decisions described herein;

F. An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

G. An award of punitive damages;

H. An award of costs that Plaintiff has incurred in this action, as well as reasonable attorneys' fees to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 18, 2026
New York, New York

**WIGDOR LLP**

By: ______________________

Daniel J. Altaras
Michael J. Willemin
(*pro hac vice* motion forthcoming)
Brooke Payton
(*pro hac vice* motion forthcoming)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
daltaras@wigdorlaw.com
mwillemin@wigdorlaw.com
bpayton@wigdorlaw.com

*Counsel for Plaintiff Matthew Cali*